J-S34034-24 & J-S34035-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF : E.M.W.H.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H.-R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 600 WDA 2024 |

Appeal from the Order Entered March 28, 2024
In the Court of Common Pleas of Warren County Orphans' Court at
No(s): A.N. 17 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: W.S.H.-R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.H.-R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 601 WDA 2024 |

Appeal from the Order Entered March 28, 2024
In the Court of Common Pleas of Warren County Orphans' Court at
No(s): A.N. No. 16 of 2023

BEFORE: DUBOW, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:      **FILED: October 15, 2024**

A.H.-R. ("Mother") appeals from the March 28, 2024 orders entered in the Court of Common Pleas of Warren County involuntarily terminating her parental rights to her daughter E.M.W.H.-R., born in October of 2021, and her

---

[*] Former Justice specially assigned to the Superior Court.

son W.S.H.-R., born in August of 2020 (collectively, "the Children").[1,2] After careful review, we affirm.

The certified record reveals the following relevant facts and procedural history. At Mother's request for assistance, Warren County Children and Youth Services ("CYS") first became involved with this family during Mother's pregnancy with E.M.W.H.-R. and provided Mother with perinatal services prior to E.M.W.H.-R.'s birth. *See* CYS Exhibit 5 (600 WDA 2024). Concerns regarding Mother's parenting capacity arose due to her performance in the perinatal services and her interactions with E.M.W.H.-R. following birth. *Id.*; CYS Exhibit 3 (600 WDA 2024); CYS Exhibit 43 at 3 (600 WDA 2024). Consequently, CYS obtained emergency custody of E.M.W.H.-R. two days after her birth in October of 2021 and placed her in foster care. *See* CYS Exhibits 3-4 (600 WDA 2024). E.M.W.H.-R. was adjudicated dependent on November 15, 2021. *See* CYS Exhibit 5 (600 WDA 2024).

Contemporaneously, W.S.H.-R. was in the custody of CYS of Schuylkill County, where Mother had resided until she moved to Warren County in

_____

[1] There was no identified father for the Children at the time of the termination hearing. Notes of Testimony (N.T.), 3/27/2024, at 7, 83, 126-128 (detailing the unsuccessful efforts to identify and confirm paternity of the Children). The orphans' court's March 28, 2024 orders also terminated the parental rights of the unknown natural fathers of the Children. No appeals have been filed in relation to the termination of the unknown natural fathers' parental rights.
[2] We address Mother's appeals at 600 WDA 2024 and 601 WDA 2024 together because they raise identical claims to the Children concerning the same factual and procedural events.

December 2020. ***See*** Notes of Testimony ("N.T."), 3/27/2024, at 71-72, 162, 183; CYS Exhibits 16-26 (601 WDA 2024). W.S.H.-R. was removed from Mother's care via emergency custody order two days after his birth in August of 2020 due to concerns about Mother's parenting capacity, mental health, unstable housing, and previous physical aggression towards young children while babysitting. ***See*** CYS Exhibit 3 at 1 (600 WDA 2024); CYS Exhibit 7 at 2 (601 WDA 2024); CYS Exhibit 17 (601 WDA 2024). W.S.H.-R. was adjudicated dependent in Schuylkill County on September 8, 2020. ***See*** CYS Exhibit 19 (601 WDA 2024).

Mother moved to Warren County in December 2020 to assist "a friend having relationship trouble" and to distance herself from the "drama" of her own mother, while W.S.H.-R. remained in placement in Schuylkill County. ***See*** N.T., 3/27/2024 at 162, 183-184. W.S.H.-R. was ultimately placed with his current pre-adoptive kinship parents in the state of Delaware in the spring of 2021, where he remained at the time of the termination proceedings. ***Id.*** at 148, 154; CYS Exhibit 21 (601 WDA 2024).

Initially, Children's respective permanency goals were set at reunification by both counties. ***See*** CYS Exhibit 5 at 2 (600 WDA 2024); CYS Exhibit 19 at 2 (601 WDA 2024). In furtherance thereof, Mother was ordered to, *inter alia*: participate in parenting classes; learn and utilize appropriate parenting techniques; complete mental health evaluations and participate in treatment; obtain and maintain stable housing; and attend all the Children's

medical appointments. *See* CYS Exhibit 5 at 2 (600 WDA 2024); CYS Exhibits 20-24 (601 WDA 2024). In addition, Mother was required to participate in supervised visitation with the Children. *Id.*

Regular permanency review hearings were held for the Children. E.M.W.H.-R.'s case was transferred to Schuylkill County after she was moved to the same pre-adoptive kinship home as W.S.H.-R in May of 2022; Children's dependency proceedings were thereafter heard simultaneously. *See* N.T. 3/27/2024, at 129, 148-149, 154; CYS Exhibit 9 (600 WDA 2024). The Children's dependency proceedings in Schuylkill County were not presided over by one single judge, but multiple rotating judges.

On October 31, 2022, the Schuylkill County orphans' court changed the Children's respective permanency goals from reunification to adoption.[3] *See* CYS Exhibit 10 at 1 (600 WDA 2024); CYS Exhibit 24 at 1 (601 WDA 2024). In a peculiar turn of events, on May 1, 2023, a different judge of the Schuylkill County orphans' court abruptly ordered the Children reunified with Mother, finding she had made moderate progress towards reunification and moderate compliance with her permanency goals. *See* CYS Exhibit 11 (600 WDA 2024); CYS Exhibit 25 (601 WDA 2024). This order for reunification was against Schuylkill County Children and Family Services' recommendation. *See* CYS Exhibit 11 (600 WDA 2024); CYS Exhibit 25 (601 WDA 2024). The Schuylkill

---

[3] There is no mention in the certified record, the Orphans' Court Opinion, or any party's appellate briefs that Mother appealed the goal change orders.

County orphans' court ordered a referral be made to Warren County CYS for an assessment of necessary services.

However, prior to the reunification, Warren County CYS determined that emergency custody was necessary due to continued concerns about Mother's parenting capacity and safety issues following an assessment of her residence. **See** CYS Exhibit 14, 18 (600 WDA 2024); CYS Exhibit 3, 7 (601 WDA 2024). Warren County CYS sought the emergency placement of the Children, who were again adjudicated dependent in Warren County on May 23, 2023. **See** CYS Exhibit 18 (600 WDA 2024); CYS Exhibit 7 (601 WDA 2024). Mother's permanency goals remained the same as previously ordered.

As to Mother's mental health, Mother indicated that she "outgrew" autism and Down Syndrome, but conceded that she had been diagnosed with bipolar disorder, anxiety, depression, and seizures likely caused by post-traumatic stress disorder ("PTSD"). **See** N.T., 3/27/2024, at 47; CYS Exhibit 18 at 2 (600 WDA 2024); CYS Exhibit 7 at 2 (601 WDA 2024). Mother complied with a mental health evaluation in September of 2021 which diagnosed her with autism spectrum disorder, specific learning disorder, adjustment disorder with disturbance of emotions and conduct, other specified disruptive impulse control, and conduct disorder. **See** N.T., 3/27/2024, at 18; CYS Exhibit 43 at 2 (600 WDA 2024); CYS Exhibit 14 at 2 (601 WDA 2024). Mother participated in virtual mental health counseling with licensed counselor Diane Mentch consistently since October of 2021. **See** N.T., 3/27/2024, at

12-16. Ms. Mentch described Mother's progress as mild over the two and a half years of treatment. *Id.* at 25.

As to Mother's parenting capacity, Mother repeatedly expressed that she did not need to participate in the court-ordered parenting classes because "she's the biological mother and therefore she knows" how to parent the Children. *Id.* at 34, 56, 58, 60, 114-115; CYS Exhibit 14 at 2 (600 WDA 2024); CYS Exhibit 3 at 2 (601 WDA 2024). Mother never completed parenting classes by the time of the termination proceeding. *See* N.T., 3/27/2024, at 82, 88, 115, 130, 143, 173.

Mother participated in a parenting and bonding assessment with Dr. Peter von Korff, Ph.D., that consisted of eight sessions over two months in June and July of 2023. *Id.* at 32-33; CYS Exhibit 43 (600 WDA 2024); CYS Exhibit 14 (601 WDA 2024). Dr. Korff ultimately concluded that Mother "would be a very inconsistent parent," putting her needs before the Children's needs and "grossly overestimating her appreciation and understanding of the Children." *See* N.T., 3/27/2024, at 50-51, 56; CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024).

The Children have special needs, which intensified the Agency's concerns about Mother's parenting capacity. E.M.W.H.-R. has multiple special needs including "extensive" physical and speech therapy; early intervention services; developmental concerns of her ears and head; allergies to eggs and cats; and has been ordered to undergo genetic testing. *See* N.T., 3/27/2024,

at 110, 117-118.  W.S.H.-R. has a peanut allergy.  *Id.* at 110.  Mother could identify the Children's allergies but was "unable to articulate secure plans" to meet the Children's needs despite Agency assistance with education.  *Id.* at 110, 112.

Mother's participation in the court-ordered supervised visitation fluctuated throughout the Children's dependency proceedings.  Mother attended supervised visitation with E.M.W.H.-R. prior to the child's move to Delaware, although the frequency of her participation is unclear from the record.[4]  *Id.* at 81, 87, 165.  Mother visited scantly with W.S.H.-R. for the first three months of his placement in Schuylkill County in late 2020.  *Id.* at 35, 147-148.  Mother had no contact with E.M.W.H.-R. for approximately one year and W.S.H.-R. for approximately two and a half years until the Children's dependency proceedings returned to Warren County in May of 2023.  *Id.* at 35, 148-149.  Mother then participated in bimonthly supervised visitation with the Children and had never progressed to unsupervised visitation at any point in their dependency proceedings.  *Id.* at 92, 126, 135, 155.

On December 21, 2023, CYS filed petitions for the involuntary termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).  The orphans' court held an evidentiary hearing on March 27, 2024, at which time the Children, then ages

---

[4] Before E.M.W.H.-R. moved to Delaware, Mother was offered two-hour supervised visits with the child three times a week.  N.T., 3/27/2024, at 87.

two and three respectively, had been removed from Mother's care since they were both two days old. The Children's best and legal interests were represented by Cynthia Klenowski, Esquire.[5]

_____

[5] Our Supreme Court has held that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in conformity with" 23 Pa.C.S.A. § 2313(a). ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020). Further, if the appointed counsel also serves as GAL, "appellate courts should review *sua sponte* whether the orphans' court made a determination" that the child's legal interests and best interests "did not conflict." ***Id.*** These findings by the orphans' court must typically be conducted **before** counsel's appointment and should appear within the orders appointing counsel. ***See id.*** at 1236 ("Both inquiries involve a yes or no answer that can be addressed by a review of the orphans' court order (or lack thereof) appointing counsel to represent a child under Section 2313(a)").

Our review of the certified record in the instant appeals reveal that the orphans' court issued decrees appointing Attorney Klenowski to represent the Children's best and legal interests in the involuntary termination matter. ***See*** Petition for Involuntary Termination of Parental Rights Preliminary Decrees, 12/22/2023. However, the orders did not determine whether the dual interests conflicted prior to Attorney Klenowski's appointment to the dual role. ***Id.*** Attorney Klenowski appeared at the relevant proceeding to represent the Children. The court determined on the record, prior to the presentation of any evidence, that Attorney Klenowski was able to represent the Children's dual interests without conflict due to their ages. ***See*** N.T., 3/27/2024, at 8-9. The Children's preferred outcome was unable to be ascertained due to their very young ages, two and three years old, respectively, at the time of the termination hearing. ***See In re T.S.***, 648 Pa. 236, 257, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal," then the mandate of § 2313(a) "is satisfied where the court has appointed an attorney-guardian *ad litem* who represents the child's best interests during such proceedings.").

Under these circumstances, we need not vacate the orders. Nevertheless, we caution the court against failing to comply with the Supreme Court's mandate to issue a separate order appointing counsel to represent the legal interests of a child involved in an involuntary termination matter and, if

*(Footnote Continued Next Page)*

CYS presented the following witnesses in support of its petitions to involuntarily terminate Mother's parental rights: Ms. Mentch, Mother's mental health counselor; Dr. Korff, who appeared as an expert witness in clinical psychology; Paige Foringer and Eric Melquist, CYS caseworkers; Megan Grady, court-appointed special advocate ("CASA") for the Children; and Kylei Davison, CYS supervisor. Mother testified on her own behalf and presented the testimony of her paramour with whom she resides, A.W.

By orders dated March 27, 2024 and entered March 28, 2024, the orphans' court terminated Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b).[6] Mother timely filed notices of appeal.[7] The orphans' court filed its Rule 1925(a) opinion on May 31, 2024.

_____

the appointed counsel also serves as GAL, to determine "**prior to appointment**" whether the child's dual interests did not conflict. **K.M.G.**, 240 A.3d at 1236 (emphasis added); **see**, **e.g.**, **Interest of A.J.R.O.**, 270 A.3d 563 (Pa. Super. 2022) (vacating involuntary termination decree because the orphans' court failed to determine whether the child's legal interests and best interests conflicted prior to appointing a single attorney to represent both; and remanding to allow the common pleas court to make the required determination).

[6] The involuntary termination decree for W.S.H.-R. also terminates Mother's parental rights under Section 2511(a)(8). As best we can discern, this is a clerical error inasmuch as W.S.H.-R.'s petition only requests involuntary termination under Sections 2511(a)(1), (2), and (5).

[7] Mother did not comply with Pa.R.A.P. 1925(a)(2)(i), which provides that the concise statement of errors complained of on appeal "shall be filed and served with the notice of appeal." By orders filed May 8, 2024, the orphans' court directed Mother to file concise statements, and she timely complied. Accordingly, we do not quash or dismiss Mother's appeals. **See**, **e.g.**, **Interest of R.R.D.**, 300 A.3d 1077, 1080-81 (Pa. Super. 2023) (concluding

*(Footnote Continued Next Page)*

- 9 -

On appeal, Mother presents the following issue for our review:

[Whether] the [orphans'] court properly rule[d] that termination of the Appellant's parental rights to the [C]hildren was warranted, in terms of establishing clear and convincing evidence that the elements of 23 Pa.C.S.A. [Section] 2511(a)(1), (2), and (5) were met.

Mother's Brief at 4 (cleaned up).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such,

_____

that the late filing of a Rule 1925(b) statement in a Children's Fast Track appeal that did not prejudice either party did not require waiver); *Cf. J.P. v. S.P.*, 991 A.2d 904 (Pa. Super. 2010) (failure to file Pa.R.A.P. 1925(b) statement of errors complained of on appeal, when ordered by the trial court, will result in waiver of all issues on appeal).

the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

***Interest of M.E.***, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. ***Id.*** at 830; 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. ***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013); 23 Pa.C.S.A. § 2511(b).

Our analysis in this case will focus upon section 2511(a)(2) and (b),[8] which provides as follows:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .

---

[8] This Court need only agree with the orphans' court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm termination. ***See M.E.***, 283 A.3d at 830 (citing ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)). Based on this disposition, we need not consider Mother's arguments with respect to Section 2511(a)(1) and (5).

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021).  Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (citing *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). In reviewing the orphans' court's findings pursuant to section 2511(a)(2), we

are mindful that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." **A.H.**, 247 A.3d at 443.

If the orphans' court concludes that adequate grounds for termination exist pursuant to Section 2511(a), the court then turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); **T.S.M.**, 71 A.3d at 267. Our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child. **In re E.M.**, 620 A.2d 481, 485 (Pa. 1993). Our Supreme Court has further explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." **Interest of K.T.**, 296 A.3d 1085, 1109 (Pa. 2023). The **K.T.** Court recognized that "case law indicates that bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." **Id.** at 1109. Further, orphans' courts "must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." **Id.** at 1106. We will not disturb an orphans' court's Section 2511(b) assessment if the factual findings are supported by the record. **M.E.**, 283 A.3d at 839.

With respect to Section 2511(a)(2), Mother baldly asserts that "she provided evidence that she was able to provide essential parental care,

control[,] or subsistence" and that "any conditions that led to the removal of the [C]hild[ren] were either remedied or could be remedied within a reasonable time." *See* Mother's Brief at 13. We disagree.

The orphans' court summarized its relevant findings as follows:

First, either Schuylkill or Warren County CYS has had custody of [the Children] throughout their lives. Mother left Schuylkill County on a whim and relocated to Warren County while [W.S.H.-R.] was in placement. . . . [Mother] gave birth to [E.M.W.H.-R.] in Warren County and did not fully utilize the resources available to her in Warren County. . . . Mother was offered numerous resources to fulfill her parental duties which she either ignored or discontinued. Mother was given many opportunities to visit the [C]hildren, but had problems managing [the Children]. She was also never fully committed to improving her treatment as she has only engaged in "mild" progress according to her therapist on the issue of coping skills. She has also failed to truly understand or address [the] [C]hildren's medical needs.

. . .

Mother also believes that she presented evidence that she was making progress in addressing the concerns and limitations present in her personal life and that she was engaged with the [C]hildren. The [c]ourt takes issue with this statement because Mother was still unable to provide any evidence at the time of the [termination] hearing that she has ever provided any care for the [C]hildren since birth.

Orphans' Court Opinion ("O.C.O."), 5/31/2024, at 6, 8.

The orphans' court findings are amply supported by the record evidence. It is clearly established that Mother suffers from repeated and continued incapacities, namely, her mental health issues and her lack of parenting capacity. The certified record shows Mother at best only achieved moderate progress towards reunification and moderate compliance with her permanency

goals over that the time that the Children had been removed from her care, which amounted to forty-three months and twenty-nine months, respectively. *See* CYS Exhibits 10-11, 19-22 (600 WDA 2024); *see also* CYS Exhibits 20-25 (601 WDA 2024). The Agency's concerns about Mother's mental health and lack of parenting capacity persisted at the time of the termination hearing.

As discussed *supra*, Mother has a myriad of mental health concerns and diagnoses. *See* N.T., 3/27/2024, at 18, 47; CYS Exhibit 18 at 2, 43 at 2 (600 WDA 2024); CYS Exhibit 7 at 2 (601 WDA 2024); CYS Exhibit 14 at 2 (601 WDA 2024). Ms. Mentch testified to treating Mother only for anxiety and depression since October of 2021 in biweekly, thirty-minute virtual sessions. *See* N.T., 3/27/2024, at 12, 16. Despite consistently participating in treatment for over two and half years, Mother only achieved mild progress and completed just one treatment goal of coping skills. *Id.* at 14-15, 25, 27-28. Mother testified that she received medication management at Beacon Light but did not specify for which diagnosis the medication pertained. *Id.* at 172. Apart from anxiety and depression, there was no evidence that Mother was receiving treatment for any of her other numerous mental health diagnoses. *Id.* at 16. It is clear that Mother's mental health issues had not been adequately addressed at the time of the termination proceeding.

There was also sufficient evidence as to Mother's lack of parenting capacity in the certified record. Dr. Korff described Mother as "grossly overestimating her appreciation and understanding of the Children," which

was corroborated by the testimony of Ms. Davison. *See* N.T., 3/27/2024, at 56; CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024). As to the Children's safety in Mother's residence, Ms. Davison testified that it took Mother over an hour to recognize that having cigarettes, lighters, ashtrays, medication, and a pocketknife within easy reach for the Children is a safety concern. *See* N.T., 3/27/2024, at 109.

As to the Children's allergies, Ms. Davison stated that Mother could identify the allergies, but she could not describe symptoms, treatments, or how to obtain emergency medical care. *Id.* at 110. Ms. Davison provided education to Mother about the Children's allergies and offered assistance researching appropriate foods. *Id.* at 112. Despite this assistance, Ms. Davison testified to an incident where Mother mixed together different types of noodles for E.M.W.H.-R. for a visit, which had to be discarded due to E.M.W.H.-R.'s egg allergy because Mother could not recall if they were egg-free noodles. *Id.* at 113.

Further, Ms. Davison provided Mother with E.M.W.H.-R.'s early intervention plans and facilitated a conversation with the kinship foster parent, which detailed the skills that Mother should assist the child with during their visitation. *Id.* at 118-119. Notwithstanding, Mother only attempted to utilize the skills when prompted and shortly after discontinued or completely declined altogether to implement these skills to support E.M.W.H.-R.'s needs. *Id.* at 119-120. Additionally, Mother never attended a single medical appointment

for the Children despite being notified of the schedule by the Agency. **Id.** at 78, 80, 116-117, 145.

Of importance, Dr. Korff noted "the obvious tension between [Mother's] voicing of her parenting aspirations and her actual history with respect to [the Children]; a history significant for her lack of involvement and her failure to take advantage of agency assistance." **See** CYS Exhibit 43 at 9 (600 WDA 2024); CYS Exhibit 14 at 9 (601 WDA 2024); N.T., 3/27/2024, at 34, 36. Mother consistently advised multiple people, including Dr. Korff, that she had all the requisite knowledge to parent the Children simply because she is their "biological" and "rightful" parent. **See** N.T., 3/27/2024 at 34, 56, 58, 60, 114-115; CYS Exhibit 14 at 2 (600 WDA 2024); CYS Exhibit 3 at 2 (601 WDA 2024). Dr. Korff found this presumption to be "completely unfounded and so thoroughly voiced by [Mother] that it was somewhat alarming." **See** N.T., 3/27/2024, at 58.

Dr. Korff testified that Mother has "an unrealistic state of mind about herself as a parent and about [the] [C]hildren," specifically noting in his report that she described her desired vision of herself to be a "perfect mother" and "super mom," wanting the Children to be "little angels." **Id.** at 45; CYS Exhibit 43 at 9, 12 (600 WDA 2024); CYS Exhibit 14 at 9, 12 (601 WDA 2024). This evidence clearly shows that Mother has failed to even acknowledge her lack of parenting capacity, despite recognizing that the Children have never lived in her care. **See** N.T., 3/27/2024, at 158.

Mother testified that she never completed the court-ordered parenting classes, which was corroborated by multiple witnesses. *See* N.T., 3/27/2024, at 82, 88, 115, 130, 143, 173. Dr. Korff opined that Mother "would be a very inconsistent parent" who puts her needs before the Children's needs, which is evident from her fluctuating consistency with the court-ordered supervised visitation. *Id.* at 50-51; CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024). Mother put her own needs before W.S.H.-R. when she moved to Warren County for self-serving explanations, leaving him behind in Schuylkill County. *See* N.T., 3/27/2024, at 146-147, 162, 183-184. Further, Mother had no contact with the Children, who were extremely young, for extended periods of time: E.M.W.H.-R. for approximately one year and W.S.H.-R. for approximately two and half years. *Id.* at 35, 148-149. Mother only resumed contact with the Children when their dependency proceedings returned to where she was residing. *Id.*

Mother never progressed past supervised visitation at any point during the Children's dependency proceedings because she "never demonstrate[d] skills that would allow [CYS] to feel that she was able to meet [the Children's] needs and create appropriate boundaries for them on her own without supervision." *Id.* at 126. Ms. Grady testified that Mother relied on any help present during visitation and detailed an incident at a visit where Mother asked Ms. Grady to watch E.M.W.H.-R., who was "crying hysterically" while Mother chased after W.S.H.-R. when he took off across a park. *Id.* at 97. This

testimony is corroborated by Ms. Davison's testimony detailing Mother's difficulty supervising the Children together during supervised visitation on multiple occasions. *Id.* at 123, 125-126. Mother contends the Agency's witnesses agreed that Mother could physically care for the Children,[9] yet all the foregoing evidence belies this assertion. *See* Mother's Brief at 13. This evidence clearly supports that Mother lacked the appropriate parenting capacity and continued to lack these necessary skills at the time of the termination proceeding. Therefore, we readily conclude that the foregoing evidence establishes the first element of Section 2511(a)(2), that Mother suffered from repeated and continued parental incapacities.

Turning to the second element of Section 2511(a)(2), we now consider whether Mother's incapacities have caused the Children to be without essential parental care, control or subsistence. Mother testified that the Children had never been in her care and does not dispute that they were each removed two days after their respective births. *See* N.T., 3/27/2024, at 158. As discussed

---

[9] As Mother does not cite to any supporting evidence, we discern that this assertion comes from the following exchange between Dr. Korff and Mother's counsel:

> Q: You indicated that [Mother] brought food and changed the diapers for the [C]hildren. So did she appear able to care for the [C]hildren's physical needs?
>
> A: Well, yeah, those were non-problematic as far as I could see.

N.T., 3/27/2024, at 67.

thoroughly above, Mother never successfully addressed her mental health issues nor demonstrated any ability to effectively care for the Children, who were two and three years old, respectively, at the time of the termination hearing, for the entirety of their lives. Thus, the record supports that Mother's incapacities have caused the Children to be without essential parental care, control, and subsistence. The second prong of Section 2511(a)(2) is satisfied.

As noted above, the third and final element of Section 2511(a)(2) requires that Mother's parental incapacities cannot, or will not, be remedied. Once again, the record is definitive and clear: Mother has not remedied neither her mental health concerns nor her lack of parenting capacity.

Mother's claim that "[a]ny deficiencies remaining could be remedied in a reasonable time,"[10] is belied by the following testimony by Dr. Korff:

> So my assessment is that I haven't seen anything from the biological mom that says she could make rapid progress. I've rather seen a kind of full stop and a decision that what suits her is apparently a half hour every other week talking to somebody about how she feels anxious rather than a challenging look at: Why have I behaved as I have? Why did I leave [the] [C]hildren? Why did I abandon them? Why do I now want them back, but don't seem to be able to really connect with them the way I ought? That would be a great start point, but I don't see [Mother] as being there at all.

N.T., 3/27/2024, at 64-65. Mother only made mild progress with mental health treatment for only two of her numerous diagnoses over two and a half years of treatment. *Id.* at 12, 14-16, 25, 27. Further, she never completed

---

[10] *See* Mother's Brief at 14.

the court-ordered parenting classes despite having several years to do so. *Id.* at 82, 88, 115, 130, 143, 173.

Overall, this evidence and testimony supports the orphans' court's conclusion that Mother's incapacities related to mental health and lack of parenting capacity cannot, or will not, be remedied. Accordingly, we observe no abuse of discretion or error of law in the orphans' court holding that termination was warranted pursuant to Section 2511(a)(2).

As the orphans' court opinion notes, Mother does not raise an issue with respect to Section 2511(b) in her concise statement or in her statement of questions involved in her appellate brief. Accordingly, this issue is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

Even if not waived, we would conclude no abuse of discretion or error of law in the orphans' court terminating Mother's parental rights pursuant to Section 2511(b). Here, the orphans' court's finding that there is no bond that exists between Mother and the Children is overwhelmingly supported by the record evidence. Dr. Korff's bonding assessment clearly revealed "an absence of attachment feeling toward [Mother]," that the Children "have developed a kind of tentative acceptance or marginal tolerance for their mandated encounters with her," describing that "at best [Mother] functions for [the Children] as an occasional playmate" and the Children "do not rely on her in

any way," which is corroborated by the testimony of Ms. Foringer, Ms. Grady, Ms. Davison, and Mr. Melquist. ***See*** CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024); N.T. 3/27/2024, at 62, 81-82, 84, 92-99, 120-125, 153. Ms. Grady also testified that there is no bond between Mother and the Children. ***See*** N.T., 3/27/2024, at 99. Dr. Korff deduced that the Children "will suffer no sense of loss if their connection to their biological mother is severed." ***See*** CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024); N.T., 3/27/2024, at 61-62.

Further, the orphans' court considered the Children's bond with the pre-adoptive kinship foster parents. ***See*** N.T., 3/27/2024, at 243; O.C.O., 5/31/2024, at 10. Conversely to Mother, Dr. Korff detailed a significant primary bond between the pre-adoptive kinship foster parents and the Children, which again is corroborated by the testimony of Ms. Grady, Ms. Davison, and Mr. Melquist. ***See*** CYS Exhibit 43 at 18 (600 WDA 2024); CYS Exhibit 14 at 18 (601 WDA 2024); N.T. 3/27/2024, at 52-54, 97-99, 122, 153. The orphans' court also considered the Children's need for permanency and the undisputed length of time the Children had been in care, which was essentially the entirety of their lives. ***See*** N.T., 3/27/2024, at 240; O.C.O., 5/31/2024, at 8, 10.

Based upon the evidence and testimony set forth above we discern no abuse of discretion or error of law in the orphans' court conclusion that CYS met its burden pursuant to both Sections 2511(a)(2) and (b). Thus, we affirm

the orphans' courts orders terminating Mother's parental rights to the Children.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

10/15/2024